**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | NO. 19-692 |
| | : | |
| **STEVE MACK** | : | |

**MEMORANDUM**
**with FINDINGS OF FACT and CONCLUSIONS OF LAW**

**KEARNEY, J.**                                                                                                   **August 24, 2020**

      The Grand Jury for this District indicted convicted felon Steve Mack with possession of a firearm, ammunition, and narcotics found by Pennsylvania parole agents in a room rented by his uncle where Mr. Mack occasionally stayed overnight. Mr. Mack asked the agents to meet him at the room on September 9, 2019 after he stayed overnight to address an outstanding absconder warrant. Mr. Mack moved to suppress this evidence. We held an evidentiary hearing evaluating the credibility of the two parole agents, Mr. Mack's uncle, and Mr. Mack's mother. After evaluating the credibility of witness testimony and admitted exhibits, we find Mr. Mack told the agents to meet him at the room to address a pending parole violation and absconder warrant for failing to disclose his change of registered home address. He welcomed the agents into the room before promptly returning a positive urine test for narcotics. An experienced agent then saw an ammunition box in a clear drawer of storage unit and Mr. Mack explained he was holding the ammunition for a friend. The agents handcuffed Mr. Mack. The agents searched the room; one agent found a loaded firearm in the bottom drawer of the clear storage unit and another agent found an unlocked safe containing, among other things, several small bags of cocaine and crack cocaine. The agents had a reasonable suspicion of parole violations, Mr. Mack welcomed them into his room, an agent found the ammunition in plain view, and with this reasonable suspicion of further

criminal conduct, the agents found the firearm and narcotics. We deny Mr. Mack's motion to suppress this evidence and his statements to the agents.

**I.      Findings of fact based on adduced evidence.**

1. The Philadelphia County Court of Common Pleas sentenced Mr. Mack to eight and a half to seventeen years imprisonment after his conviction for first-degree robbery. The Commonwealth released Mr. Mack on October 6, 2016 subject to agreed parole conditions for the balance of his sentence.[1]

2. To ensure release on parole before completing his full sentence, Mr. Mack signed a "conditions of parole" form agreeing he: (1)  may not change his "approved residence . . . without the written permission of the parole supervision staff"; (2)  "abstain from the unlawful possession or sale of narcotics and dangerous drugs"; (3)  "refrain from owning or possessi[ng] any firearms or other weapons"; (4)  "achieve negative results in screening tests randomly conducted by the board to detect . . . use of controlled substances"; and (5) "not possess ammunition under any condition or for any reason."[2]

3. The Commonwealth required Mr. Mack to check-in with his parole agent every three months, maintain employment, and avoid criminal conduct with a specific condition of not possessing ammunition in addition to a firearm.

4. By May 2019, Mr. Mack registered his approved residence in a rooming house at 5844 Vine Street, Philadelphia.  Mr. Mack's mother and uncle both visited him there although neither ever saw his room.

5. In late May 2019, parole agents notified Mr. Mack of the identity of his new parole officer Agent April Tiffany and required him to contact her within a week.

6. He failed to do so for several months.

7. Agent Tiffany attempted to visit Mr. Mack on August 26, 2019 for purposes of his regular meeting at his approved residence but did not find him there.[3]

8. Agent Tiffany tried again to visit Mr. Mack at his approved residence on August 28, 2019 and did not find him there.[4] Another tenant at the approved residence told Agent Tiffany Mr. Mack no longer lived there. Agent Tiffany asked the tenant if he had a phone number for Mr. Mack or if he knew where Mr. Mack moved. The tenant denied knowing Mr. Mack's phone number or where he moved. Upon viewing the room, Agent Tiffany concluded none of Mr. Mack's belongings were there.[5]

9. Agent Tiffany issued an absconder warrant for Mr. Mack for violating his parole condition requiring he receive written permission from parole supervisory staff before changing his approved residence.

10. Mr. Mack called the parole office on September 4, 2019.[6] As Agent Tiffany was out of office, Supervisor Justin Wank spoke to Mr. Mack. Mr. Mack told Supervisor Wank he moved to 113 North Paxon Street (an incorrect address or the Supervisor wrote it down incorrectly) and he thought he gave Agent Tiffany his phone number. Supervisor Wank told Mr. Mack of the absconder warrant for his arrest and Supervisor Wank will have to "make contact with him" and check with the "chain of command" to resolve the absconder warrant issue.[7]

11. Agent Tiffany contacted Mr. Mack later the same day. He told her he moved to North Paxon Street and they agreed to meet on September 9 at North Paxon Street to resolve the absconder warrant as part of their first meeting.

12. On September 9, Supervisor Wank and Agent Tiffany went to Mr. Mack's identified address at 133 North Paxon Street, Philadelphia.[8] Agent Tiffany brought a Home

Provider Agreement for this property. The premises at 133 North Paxon Street is a rooming house with multiple floors and bedrooms.

13. Mr. Mack's uncle, Scott Demby, testified he rented a room at 133 North Paxon Street and permitted Mr. Mack to stay overnight in his room on three or four occasions, including the evening of September 8, 2019, the night before his arrest. Mr. Demby further swore Mr. Mack brought bags with him from time to time and Mr. Demby gave Mr. Mack a key to the room. Mr. Demby is a felon and prohibited from possessing a firearm. He swore he knew of this prohibition and did not possess a firearm. He also swore he allowed at least two other identified men to use his room on North Paxon Street and they also sometimes slept overnight there.

14. On September 9, Mr. Mack opened the front door and led Supervisor Wank and Agent Tiffany up the stairs to his room on the second floor. The room included a larger mattress, television, television stand, mini-refrigerator, and a clear storage shelving unit of three shelves next to the mattress.

15. The parties did not adduce evidence of any other person present in the room at the time.

16. Upon entering the room, the Agents asked Mr. Mack to provide a urine sample. Mr. Mack left the bedroom to go to a bathroom right next door (with a shared wall) in the second-floor hallway. Agents waited in the room where Mr. Mack slept while he provided the urine sample.

17. While Supervisor Wank and Agent Tiffany waited for Mr. Mack to return with the urine sample, neither searched the room and Mr. Mack did not ask Agents to leave the room.

18. Mr. Mack returned to the room with the urine sample where agents tested it. The urine sample tested positive for THC, cocaine, and oxycodone. Mr. Mack admitted to smoking marijuana but denied the use of cocaine or oxycodone. Supervisor Wank testified in his experience

when a parolee admits to taking some illegal drugs but not others, it usually means the parolee could be packaging narcotics.

19. Supervisor Wank then noticed the clear plastic shelving unit contained what he thought may be a green and yellow Remington ammunition box. Supervisor Wank testified he is familiar with firearms and ammunition because he carries a firearm for work and is a life-long hunter.

20. Supervisor Wank did not search the room before seeing the green and yellow Remington ammunition box.

21. After Supervisor Wank observed the ammunition in plain view, he retrieved three boxes of ammunition out of the top drawer of the clear plastic shelving unit next to the bed.

22. Supervisor Wank testified the three ammunition boxes were for different sized bullets leading him to believe there may be additional firearms in the room.

23. Supervisor Wank then placed Mr. Mack in handcuffs for his and Agent Tiffany's safety.  Supervisor Wank pulled the boxes of ammunition out of the drawers and placed them on the bed.

24. Mr. Mack told the Agents he held the ammunition for a friend and it is not a parole violation to do so.

25. Supervisor Wank asked Mr. Mack, then handcuffed, if they could search the room, to which Mr. Mack responded there is no other contraband in the room and gave permission to search.  Mr. Mack denied this later consent while arrested.  We are not finding Mr. Mack provided specific consent after arrest.  But he did always consent to the Agents entering and staying in the room where they found ammunition in plain view, arrested him, and then had reasonable suspicion of other possible parole violations to allow a search of the parolee's room.

26. Supervisor Wank testified he had reasonable suspicion to believe Mr. Mack had additional parole violations because of the positive urine test and the possession of ammunition and had a concern for officer safety.

27. Supervisor Wank and Agent Tiffany then conducted a search of Mr. Mack's room to look for evidence of additional parole violations.

28. Supervisor Wank opened the bottom drawer of the clear plastic shelving unit and found a cocked .38 caliber revolver later determined to be loaded with five live rounds of ammunition.

29. Supervisor Wank testified he moved Mr. Mack to a chair in the room to position him as far away from the gun as possible; he did not unload the gun; and called police.

30. Both Supervisor Wank and Agent Tiffany testified Mr. Mack blurted out he had a gun for his protection and then became angry, banging his head off the wall of the room.

31. Agent Tiffany then found an unlocked safe on the closet floor with a black case containing drugs, a watch, money, and a single bullet. The safe contained two clear, plastic baggies containing forty-six yellow, Ziplock packets of alleged cocaine, and within one of the same plastic baggies, a purple tube-like container with five yellow, three blue, and two purple packets of alleged crack cocaine; a clear plastic baggie of alleged marijuana; one loose bullet; jewelry; $911 in cash; and a digital scale.[9]

32. After finding the firearm and narcotics, the agents called Philadelphia police. Police secured the firearm and took it, the narcotics, ammunition, and currency for processing.

33. The Philadelphia Police tested the firearm and found it operable. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") investigated and found the firearm had been manufactured outside of Pennsylvania.[10]

34.     The Philadelphia Police Department's Chemistry Unit Laboratory tested the narcotics and found the substance in the forty-six Ziplock packets to be powder cocaine weighing approximately 20.5 grams net; ten packets of crack cocaine weighing approximately 0.5 grams net; and positive marijuana.

35.     The grand jury indicted Mr. Mack for possession with intent to distribute cocaine and for possession of a firearm in furtherance of a drug trafficking crime and felon in possession of a firearm.[11]  On August 4, 2020, the grand jury returned a Superseding Indictment adding charges of felon in possession of ammunition.[12]  Trial is scheduled for September 21, 2020.

36.     Mr. Mack through the Federal Defender moved to suppress items seized by parole agents and statements made by Mr. Mack during the parole agents' September 9, 2019 visit.[13] Mr. Mack moves to suppress the physical items seized from 133 North Paxon Street as well as his statements as violative of his Fourth Amendment right to be free of unreasonable search and seizure. After electing to proceed *pro se*, Mr. Mack filed a supplemental Motion to suppress physical evidence and statements.[14]  The United States opposes the motions.[15]

37.     In both his counseled and *pro se* motions, Mr. Mack concedes he is a parolee and, under the Fourth Amendment, parole agents are not required to have a warrant or probable cause before searching his residence but must still have a reasonable suspicion they will find evidence of parole violations.  Mr. Mack argues the parole exception does not apply because agents lacked reasonable suspicion; the plain view doctrine does not apply; and agents did not obtain a valid consent to search, thus all physical items and his statements must be suppressed as fruit of an illegal search.

38.     In his *pro se* supplemental motion, Mr. Mack makes a new argument: when Agent Tiffany went to 5844 Vine Street on August 28, 2019, she concluded Mr. Mack no longer resided

7

there based only on the word of an unidentified tenant; conducted a warrantless search of his registered residence to support her conclusion he no longer had belongings there; and issued an absconder warrant which then served as the basis for Supervisor Wank's and Agent Tiffany's visit to 133 North Paxon Street.

39. The United States argues three reasons why th is no Fourth Amendment violation for the search performed at 133 North Paxon Street: (1) Mr. Mack consented to their entry into the room where Supervisor Wank observed the ammunition in plain view; (2) even assuming agents' entry into Mr. Mack's room lacked consent, they had reasonable suspicion to search the room for evidence of parole violations (and thus did not violate the Fourth Amendment) because the agents knew Mr. Mack relocated without permission and failed the urine test giving them justification to search the bedroom without a warrant or consent; and (3) once agents were lawfully inside the room—either by Mr. Mack's consent or because agents had reasonable suspicion to believe evidence of parole violations would be found, or both—Supervisor Wank saw ammunition in the clear drawers of the shelving unit giving Agents authority to conduct a broad search of the room to find evidence of parole violations.

**II. Conclusions of law.**

40. Mr. Mack has standing under the Fourth Amendment to challenge the constitutionality of the search and seizure as he enjoyed a reasonable expectation of privacy in the room at 133 North Paxon Street.[16] To prove Fourth Amendment standing, Mr. Mack must show both a subjective expectation of privacy in the premises and his expectation is objectively reasonable.[17] "As the Supreme Court has explained, a person who lacks the requisite expectation of privacy and is 'aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any

8

of his Fourth Amendment rights infringed.'"[18]  Under the Supreme Court's precedent in *Olson*, overnight guests in another's home have an expectation of privacy.[19] "In reaching its conclusion, the [Supreme] Court reasoned that '[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society' and 'society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.' . . . The Supreme Court's analysis was also informed by its observation that an overnight guest 'seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside.'"[20]  By contrast, a person "who is merely present with the consent of the householder may not" have a legitimate expectation of privacy affording Fourth Amendment standing.[21]  Our Court of Appeals has not determined "whether Fourth Amendment rights attach somewhere on the spectrum between 'overnight guest' and 'merely present with the consent of the householder.'"[22]

41. In *United States v. Rose,* our Court of Appeals determined the defendant, "a short term social guest" of another searched by police, did not have standing to assert his Fourth Amendment right and affirmed the denial of his motion to suppress.  In making its determination based on the record before it, our Court of Appeals found the defendant had no possessory interest in any part of the apartment; did not store any clothing or property at the apartment; had no key to the apartment; did not have permission to be at the apartment without the owner's presence or consent; did not receive mail at the apartment; five other guests had common access to the areas in the apartment occupied by him; he had no ability to and made no effort to exclude others from any part of the apartment; he was a casual acquaintance of the apartment owner; and "because no evidence was elicited at the suppression hearing suggesting [the defendant] had ever even visited [the apartment] before the search, he was, it seems, an infrequent visitor to the apartment."[23]

42. Based on the testimony at the suppression hearing, Mr. Mack falls into the category of an overnight guest with a legitimate expectation of privacy in his uncle's room under *Olson*. Although Mr. Mack may not have a possessory property interest in his uncle's rented room as of September 9, 2020, he came there to stay the night of September 8 and his uncle gave him a key and permission to stay, as Mr. Mack had done on three to four earlier occasions. Mr. Mack told his uncle he would be meeting with his parole agent at 133 North Paxon Street.

43. Mr. Mack voluntarily disclosed this room to the Agents, consented to the Agents entering the room, and staying there without objection. While there, they learned of the positive urine test for narcotics and then viewed the ammunition. "One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."[24] "To justify a search based on consent, the Government 'has the burden of proving that the consent was, in fact, freely and voluntarily given.'"[25] We examine the "totality of all the circumstances" to determine whether an individual voluntarily consented to a search.[26] Factors we consider include: "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment."[27]

44. Mr. Mack voluntarily allowed parole agents to enter his room where he slept overnight. There is no evidence of Agents verbally or physically threatening him; the atmosphere as hostile; guns drawn; or he is of such a young age, low education level or diminished intelligence to deem him incapable of withholding consent. Having consented to agents *entering the room*, Mr. Mack cannot now complain what the Agents plainly saw while standing in the room, i.e., boxes of ammunition. After two established parole violations and observing boxes of ammunition

in plain sight, the Agents had reasonable suspicion to search for additional parole violations. Mr. Mack elicited no evidence to refute this testimony.

45. In addition to the initial consent to be in the room, the Agents demonstrated a reasonable suspicion to justify the continued search of Mr. Mack's room. The Fourth Amendment prohibits unreasonable searches and seizures. Generally, a warrantless search is "'unreasonable *per se*' absent a few 'exceptions.'"[28] One exception is the "parole/probation exception": where a Pennsylvania parolee consents to a warrantless search of his home as a prerequisite to being paroled, "'no more than reasonable suspicion' is required to justify a search."[29]

46. "'Reasonable suspicion' exists when law enforcement agents have 'a particularized and objective basis for suspecting legal wrongdoing' has occurred or that evidence will be found."[30] Suspicion must be based on "specific and articulable facts" and, in "assessing the totality of the circumstances, law enforcement agents may permissibly assume that parolees 'by virtue of [their] status . . . [are] more likely than the ordinary citizen to violate the law.'"[31] When a parolee signs a consent agreement, "both sides" of the balance—an individual's privacy on one hand and a legitimate government interest on the other—"are affected: the parolee's reasonable expectation of privacy is decreased and the government's reasonable need to monitor behavior is increased."[32]

47. Two parole violations gave the Agents reasonable suspicion to search Mr. Mack's bedroom. Supervisor Wank and Agent Tiffany testified an absconder warrant had already issued for Mr. Mack as Mr. Mack reported to moving to 133 North Paxon Street which had not been approved. Mr. Mack compounded this registration violation with a positive urine sample for THC, cocaine, and oxycodone. Mr. Mack admitted to marijuana (THC) and, in their experience, a parolee could be packaging cocaine. Under the totality of the circumstances, Supervisor Wank and Agent

Tiffany had a "particularized and objective basis for suspecting legal wrongdoing" occurred "or that evidence will be found," meeting the standard for the parole/probation exception.

48.     In addition to consent to be in the room and with the reasonable suspicion of further parole violations, Supervisor Wank then found the ammunition in plain view of the top drawer of the clear storage unit allowing him to seize it without a warrant given the parole special condition. Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."[33] "The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment[.]"[34]

49.     "Three elements must be satisfied to seize an item under plain view: (1) 'the officer [must] not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed'; (2) the object's 'incriminating character must also be immediately apparent'; and (3) the officer 'must also have a lawful right of access to the object itself.'"[35]

50.     Given their reasonable suspicion, the Agents did not violate the Fourth Amendment by being in the room. Supervisor Wank credibly testified the Remington ammunition box which he recognized from his work experience, as well as from being a life-long hunter, was apparent to him once he looked closely at the storage unit in the room. The Agents had a lawful right of access to the ammunition.

51.     Based on the demonstrated reasonableness of their suspicion and aware of ammunition and drug use, the Agents then had the lawful right to search leading to first find the

firearm in the bottom drawer of the storage drawers and then the open safe in the closet containing, among other things, cocaine and cocaine base.

## III. Conclusion

We carefully evaluated the credibility of the parole agents, Mr. Mack's uncle and his mother. Mr. Mack has standing to challenge the constitutionality of the search of the room he stayed in on September 8 and 9, 2019. He fails to show a basis to suppress the evidence. We deny his motion to suppress.

---

[1] ECF Doc. No. 21-1 at 2.

[2] *Id.* at 3-4.

[3] The record contains case notes maintained by probation Agents. ECF Doc. No. 56 at 28-32. Mr. Mack concedes he is required, among other things, to meet with his parole Agent once every three months. *Id.* at 2.

[4] *Id.* at 30.

[5] *Id.*

[6] *Id.* at 31.

[7] *Id.*

[8] ECF Doc. No. 21 at 3.

[9] ECF Doc. No. 21 at 6.

[10] ECF Doc. No. 21 at 7.

[11] ECF Doc. No. 1.

[12] ECF Doc. No. 41.

[13] ECF Doc. No. 12. Mr. Mack asked to replace the Federal Defender and we appointed experienced counsel from our Criminal Justice Act Panel. ECF Doc. No. 18. He then asked to terminate the relationship with the experienced counsel (ECF Doc. No. 34) and, after colloquy, repeatedly confirmed his intent to proceed without representation. We appointed stand-by counsel from our Panel.

[14] ECF Doc. No. 56.

[15] ECF Doc. No. 21.

[16] *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). We find no possible merit in Mr. Mack's *pro se* challenge to Agent Tiffany's August 28, 2019 review of his registered residence on Vine Street. There is no evidence of crime at this registered residence. He agreed parole agents could review his registered residence. And the credible testimony at trial confirmed Mr. Mack left the Vine Street residence due to bed bugs. There is no evidence of a firearm or narcotics at the registered residence. To the extent Mr. Mack wishes to preclude the statement of another tenant, the tenant's statement is not made by him nor is there a constitutional reason he or she could not volunteer information to Agent Tiffany. Whether she is credible may be a question for the jury but the evidence of an empty registered residence appears undisputed as of now.

[17] *United States v. Rose*, 613 F. App'x 125, 128 (3d Cir. 2015) (citing *Rakas,* 439 U.S. at 143 & n.12 (1978); *United States v. Donahue*, 764 F.3d 293, 298-99 (3d Cir. 2014)).

[18] *Id.* (quoting *Rakas*, 439 U.S. at 134).

[19] *Olson*, 495 U.S. at 98.

[20] *Rose*, 613 F. App'x at 128 (quoting *Olson*, 495 U.S. at 98-99).

[21] *Id.* at 129 (quoting *Minnesota v. Carter*, 525 U.S. 83, 90 (1998)).

[22] *Id.*

[23] *Id.* at 130 (internal citations omitted).

[24] *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[25] *United States v. Price*, 558 F.3d 270, 277-78 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

[26] *Schneckloth*, 412 U.S. at 227.

[27] *Price*, 558 F.3d at 278 (citing *Schneckloth*, 412 U.S. at 226).

[28] *United States v. Gay*, 724 F. App'x 122, 124 (3d Cir. 2018) (quoting *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011)).

[29] *Id.* at 124-25 (quoting *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005)). But under Pennsylvania law and Mr. Mack's conditions of parole, parole agents may not subject Mr. Mack to search at any time or for any reason. *United States v. Henley*, 941 F.3d 646, 651 (3d Cir. 2019). Pennsylvania law requires reasonable suspicion: "A property search may be conducted by an agent

---

if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision." 61 Pa. Cons. Stat. Ann. § 6153(d)(2).

[30] *Gay*, 724 F. App'x at 125 (quoting *Williams*, 417 F.3d at 376).

[31] *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1 (1968); *Samson v. California*, 547 U.S. 843, 849 (2006)).

[32] *Williams*, 417 F.3d at 376 (quoting *United States v. Knights*, 534 U.S. 112, 119 (2001)).

[33] *United States v. Scott*, 777 F. App'x 54, 56 (3d Cir. 2019) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

[34] *Id.*

[35] *United States v. Hawkins*, 646 F. App'x 254, 256 (3d Cir. 2016) (quoting *Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011)).