**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO.  19-692** |
| | : | |
| **STEVE MACK** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                    **January 26, 2021**

Our jury found *pro se* Defendant Steve Mack guilty on two charges of being a felon in possession of a firearm and ammunition. Mr. Mack now *pro se* moves for acquittal under Federal Rule of Criminal Procedure 29 arguing insufficient evidence to support the jury's verdict, misconduct by the United States attorneys, and the search leading to the charges against Mr. Mack violated the Fourth Amendment. He posits several theories as to why the jury's verdict on the firearm possession is inconsistent with his view of the evidence. He then attacks the United States attorneys for presenting evidence which prejudiced him and claims witnesses perjured themselves. He also attempts to revisit our denial of his pretrial suppression motion.   After scouring the trial transcript, Mr. Mack's arguments lack merit and are misplaced.  He offers no basis to vacate the jury's conviction for possession of a firearm and ammunition as a convicted felon. We deny Mr. Mack's post-trial motion.

## I.      Background

Pennsylvania parole agents April Tiffany and Supervisor Justin Wank visited Steve Mack, on parole from state charges, on September 9, 2019. During the September 9 home visit, Mr. Mack tested positive for drug use and agents found a firearm, ammunition, a safe containing drugs, jewelry, currency, a bullet, and a digital scale. Agents called Philadelphia police who arrested Mr. Mack.

On December 3, 2019, our grand jury indicted Mr. Mack on charges of (1) possession with intent to distribute cocaine and cocaine base under 21 U.S.C. § 841(a)(1); (2) possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(l); and (3) convicted felon in possession of a firearm under 18 U.S.C. § 922(g)(l). On August 4, 2020, a superseding indictment added a fourth charge: convicted felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).[1]

### A.    Pre-trial suppression motion, motions *in limine*, and bifurcation.

Mr. Mack, represented by the Federal Defenders, moved to suppress all physical evidence and statements made to parole agents on September 9 arguing fruit of the agents' warrantless search of a room he occasionally slept including the night before.[2] Mr. Mack argued the parole exception to the warrant or probable cause requirement did not apply to the search of this room because Supervisor Wank and Agent Tiffany did not have reasonable suspicion they would find evidence he violated the conditions of his parole. Mr. Mack also argued the plain view doctrine did not apply and he did not consent to a search.[3]

We held an extensive evidentiary hearing on Mr. Mack's suppression motion evaluating the credibility of Supervisor Wank, Agent Tiffany, Mr. Mack's uncle, and Mr. Mack's mother. After evaluating the witnesses' credibility and admitted exhibits, we found the parole agents' search valid under the Fourth Amendment and denied Mr. Mack's motion to suppress.[4]

The United States then moved to admit four pieces of evidence at trial: (1) background evidence of Mr. Mack's status as a state parolee; (2) earlier convictions as impeachment under Federal Rule of Evidence 609(a)(1) if Mr. Mack testified; (3) recorded calls and transcripts of six telephone calls between Mr. Mack and family while incarcerated; and (4) a determination cell phone site and call details of Mr. Mack's cell phone in the month leading up to his September 9,

2019 arrest, certified conviction records, and certified incarceration records qualify as business records and/or public records under Federal Rules of Evidence 803(6), (8).[5]

We held argument on the United States' motions *in limine* at our final pre-trial conference and held a *Starks* hearing on the authenticity of the recorded phone calls.[6]  Based on the evidence adduced at the hearing, we found the United States produced clear and convincing evidence of the authenticity and accuracy of the audio recordings under the *Starks* factors. We granted the United States' motion *in limine* to admit the recorded jail phone calls and granted the United States' other motions *in limine*.[7]

At our final pre-trial conference, Mr. Mack requested bifurcation of the felon in possession of a firearm and ammunition charges, 18 U.S.C. § 922(g), from the drug possession and related firearm charges.[8] We granted Mr. Mack's request and bifurcated Counts One and Two–possession with intent to distribute cocaine and cocaine base, 21 U.S.C. § 841(a)(1) and possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)–from Counts Three and Four–felon in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(1).

We began trial on September 23, 2020.

## B.    Summary of evidence adduced at trial.

The United States presented evidence on the drug possession and related firearm charges (Counts One and Two) over two days.  It adduced testimony from: Supervisor Wank; Agent Tiffany; Amy Mammarella, Pennsylvania parole agent; Ninan Varughese, Philadelphia Police Department, Office of Forensic Science, Chemistry Lab, qualified as an expert in controlled substances; Gregory Welsh, Philadelphia Police Department, Firearms Identification Unit, qualified as a firearms expert; Randy Updegraff, Special Agent, Drug Enforcement Agency, qualified as an expert in narcotics and narcotics trafficking in the Philadelphia area; Michael

Plesniak, Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives, qualified as an expert in cell site analysis; and Jason Santo Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives, primary investigator in Mr. Mack's case.

Mr. Mack did not put on witnesses. He testified on direct examination and on cross-examination. The United States moved thirty-five exhibits into evidence. Mr. Mack did not move exhibits into evidence.

Amy Mammarella, an institutional reentry agent at SCI-Graterford at the time of Mr. Mack's release from state prison, testified she worked with inmates being released on parole including Mr. Mack.[9] Agent Mammarella testified she signed a parole release form for Mr. Mack on October 3, 2016 listing conditions of parole including: "your approved residence is listed below and may not be changed without the written permission of the parole supervision staff . . ."; "you shall refrain from owning or possessing any firearms or other weapons"; and "you shall not possess ammunition under any condition for any reason."[10] Agent Mammarella testified Mr. Mack signed the parole release form and she explained the conditions of his parole to him.[11]

The United States introduced evidence of the Commonwealth placing Mr. Mack on parole on October 6, 2016.[12]

Agent Tiffany testified she began to supervise Mr. Mack at the end of May 2019.[13] Agent Tiffany testified in late May 2019, Mr. Mack had an approved residence at 5844 Vine Street, Philadelphia.[14] Agent Tiffany testified she believed Mr. Mack resided at 5844 Vine Street, Mr. Mack did not contact her despite being instructed to do so, and on August 26 and August 29, 2019, she attempted to visit Mr. Mack at his approved residence, 5844 Vine Street.[15] Agent Tiffany did not find Mr. Mack at 5844 Vine Street. Other residents of the house told her Mr. Mack moved out, and when she checked Mr. Mack's room, she found it empty with no indication anyone lived

there.[16] Agent Tiffany issued an absconder warrant because Mr. Mack moved from his approved residence without written permission from the parole office, a violation of his conditions of parole.[17]

On September 4, 2019, Mr. Mack called the parole office and spoke to Supervisor Wank.[18] Supervisor Wank testified Mr. Mack told him he moved to an address at 133 North Paxon Street in Philadelphia.[19] Supervisor Wank testified Mr. Mack admitted he moved without permission. Supervisor Wank told Mr. Mack about the absconder warrant which needed to be resolved and directed Mr. Mack to call Agent Tiffany.[20] Mr. Mack called Agent Tiffany the same day, September 4, 2019. Agent Tiffany testified she put Mr. Mack's cell phone number in her phone's contacts and later took a screen shot of her cell phone with Mr. Mack's phone number.[21] Agent Tiffany spoke with Mr. Mack on September 4, 2019 and they arranged a home visit for September 9, 2019 at the North Paxon Street address.[22]

Agent Tiffany testified she and Supervisor Wank arrived at 133 North Paxon Street on September 9, as agreed to by Mr. Mack, and called Mr. Mack on the same cell phone number from her contacts to tell him she and Supervisor Wank were outside the residence.[23] Agent Tiffany brought a home provider agreement form with her to approve North Paxon Street as Mr. Mack's new residence and to possibly clear up the absconder warrant.[24]

Mr. Mack answered the phone call made by Agent Tiffany, went downstairs, and opened the door to the residence.[25] Mr. Mack led Supervisor Wank and Agent Tiffany upstairs to a second-floor bedroom. Both agents testified Mr. Mack told them "that was where he was living."[26] Supervisor Wank testified he saw an air mattress in the bedroom, a chair, mini refrigerator, shoe rack, television on a stand, a small drawer unit, and men's clothing and shoes; the room appeared

to be lived in.[27] Once inside the bedroom, Mr. Mack and the agents had a short conversation and Supervisor Wank testified Mr. Mack told the agents he wanted to stay at North Paxon Street.[28]

Agents asked Mr. Mack to take a drug test through a urine sample.[29] Mr. Mack's urine sample tested positive for THC, cocaine, and oxycodone.[30] Supervisor Wank testified around the time Mr. Mack returned to the bedroom with his urine sample, he observed a clear plastic shelving unit containing clothes to the right of the mattress, as a nightstand would be positioned.[31] In the top drawer, Supervisor Wank noticed clothes were "pushed down a little bit" by a yellow and green box which he recognized as Remington ammunition. Supervisor Wank testified he recognized the yellow and green box as ammunition because he carries a firearm for work and is a hunter.[32]

After observing the yellow and green box which he recognized as ammunition, Supervisor Wank pulled open the top drawer and found three boxes of ammunition.[33] Supervisor Wank took photographs of the ammunition, admitted into evidence, and confirmed he took the photographs showing boxes of ammunition he found.[34]

Supervisor Wank handcuffed Mr. Mack and placed him in custody. Supervisor Wank and Agent Tiffany testified Mr. Mack voluntarily stated he held the ammunition for a friend.[35] Supervisor Wank and Agent Tiffany then conducted a wider search. Supervisor Wank found a firearm.[36] Both Agents testified, upon discovery of the firearm, Mr. Mack voluntarily stated he had the firearm for protection.[37] In the bedroom closet, Agent Tiffany found a safe containing packets of cocaine and crack cocaine, cash, a digital scale, two watches, jewelry, and a single bullet.[38] Agent Tiffany and Supervisor Wank called Philadelphia police who took the contraband and arrested Mr. Mack.

The United States adduced cell site and cell phone records for Mr. Mack's cell phone number used to contact Agent Tiffany. Special Agent Plesniak, qualified as cell site expert,

testified to the location of Mr. Mack's cell phone between August 1, 2019 and September 9, 2019 as collected from T-Mobile records.[39] The United States adduced evidence showing the cell phone associated with the number Agent Tiffany called to arrange the September 9, 2019 meeting belonged to Mr. Mack. In addition to Agent Tiffany's testimony she took a screen shot of Mr. Mack's cell phone number and contacted him on that number, Special Agent Plesniak testified to a summary report he prepared of cell site records received from T-Mobile, which the United States moved  into evidence.[40]

Special Agent Plesniak testified from August 1, 2019 through September 9, 2019, Mr. Mack's cell phone connected to T-Mobile cell phone towers in "close proximity" to 133 North Paxon Street 74.43 percent of the time, or 2,017 contacts made from the cell phone.[41] Special Agent Plesniak testified for the same period, Mr. Mack's cell phone connected to T-Mobile cell towers "in the vicinity" of 5844 Vine Street–Mr. Mack's last approved residence–3.73 percent of the time and connected to a cell tower "a little bit northeast of North Paxon Street . . . only about ten percent of the time."[42] Special Agent Plesniak testified in his opinion, "the cell phone spent more time in the area of 133 North Paxon Street. That's where I would expect the person to be living."[43]

Special Agent Plesniak testified to "a bed-down location" which assumes cell phone users do not use their phones when they are asleep. Special Agent Plesniak testified he looked at cell phone call detail records for Mr. Mack's phone from the last call at night to the first call in the morning to determine the "bed-down location."[44] Special Agent Plesniak analyzed the calls for the week before Mr. Mack's September 9, 2019 arrest and testified for each of those days, the cell phone connected to cell towers near North Paxon Street and opined the break in time from the last contact to the first contact suggested sleeping time.[45]

Agent Santo, the primary case agent investigating the charges against Mr. Mack, testified he created a summary chart of T-Mobile records associated with the cell number attributed to Mr. Mack, which the United States moved into evidence.[46] Agent Santo's summary identified names of individuals and their relationship to Mr. Mack, their phone numbers, and the number of calls made to each individual from Mr. Mack's cell phone in the August 1, 2019 to September 9, 2019 time period.[47]

Agent Santo testified Agent Tiffany's cell phone number is shown as calling Mr. Mack's cell phone and Mr. Mack's cell phone called Agent Tiffany's cell phone on the morning of September 9, 2019, corroborating Agent Tiffany's testimony she called Mr. Mack and Mr. Mack called her from his cell phone–the contact number on her screen shot.[48] Agent Santo testified the number associated with Mr. Mack's cell phone called his mother Joyce Demby forty-four times, his uncle Scott Demby 613 times, and his girlfriend 423 times.[49]

The United States adduced evidence of consensually recorded calls made by Mr. Mack from jail to his mother, uncle, and girlfriend. Agent Santo testified he listened to the jail calls, recognized Mr. Mack's voice, and prepared a transcript of six calls between September 13, 2019 and December 1, 2019.[50] The United States played recordings of each of the six calls for the jury. On the recorded calls, Mr. Mack made the following statements:

- On a September 13, 2019 phone call with his uncle Scott Demby: "But listen, they did some crazy s***, uh, they basically, uh, *opened my jawn without a warrant*, you feel me? My safe."[51]

- On a September 23, 2019 phone call with his mother Joyce Demby: "*Did my uncle ever bring all my stuff to you*?" To which Ms. Demby replied, after discussion about the ownership of an air conditioner: "He brought everything else though, refrigerators and all that."[52] Mr. Mack asked his mother whether his uncle returned heaters.[53]

- On a September 26, 2019 phone call with his girlfriend: Mr. Mack referred to "all that stuff that was in my house" to which his girlfriend replied, "All your clothes and stuff." The girlfriend asked, "That was at your house, they took it to your mom house [sic]?" Mr. Mack

responded, "Yeah. But I don't think he took my f***ing heaters and s*** like." The girlfriend asked Mr. Mack if he is worried to which Mr. Mack responded, "Yeah. I think he left my air conditioner in there." When the girlfriend told Mr. Mack she did not tell "him" – presumably, Mr. Mack's uncle – to "get all that. He just took your clothes. I just told him your clothes. I didn't say nothing about no, no heaters," Mr. Mack responded, "He said just get my clothes? . . . *I said get my stuff. I didn't say get no clothes, Like I got a lot of s*** in there* . . . No. That is what I telling you to do.  And that's what I be meaning. *I told you to tell him to get all my stuff out of my house*. That's exactly what I told you to do."[54] After discussing concerns about his heaters and air conditioner, Mr. Mack said, "***Real s***. That s*** on my property. I'll go right in there if they got my s***.***"[55]

- On a September 27, 2019 phone call with his uncle Scott Demby: Mr. Mack asked his uncle "when you moved that stuff out of the crib, did you get everything?" When Mr. Demby confirmed he "got everything" including "the heaters," Mr. Mack responded, "Cause my girl, my girl talking about, oh, I only told him to get the clothes and s*** and I'm like what?" Mr. Demby responded, "No, no, I cleaned the room." Mr. Demby clarified he took the television, but the television stand fell apart and he did not take it.  Mr. Demby told Mr. Mack, "You know those cabinets you had up in the corner? The little plastic little cabinets – that went to your Mom's house because that didn't fall apart." Mr. Mack told Mr. Demby, "*I brought everything. All that stuffs in there was in, was uh, mine*."[56]

- On a November 4, 2019 call with his mother Joyce Demby: Mr. Mack discussed with his mother money to pay for an attorney and told his mother, "***They took my money***" and "***They went into my safe. They took my, they opened my safe***" and he had "a little bit over like a thousand dollars and some s***."[57]

- On a December 1, 2019 call with his father from his mother's cell phone: Mr. Mack told his father he filed three motions "so hopefully they gonna land, and hopefully, I'm hoping one of these jawns gonna get granted, ***but the way they searched my house***, it was like . . ."[58]

The United States adduced evidence from Officer Welsh, firearms expert from the Philadelphia Police Department's Firearms Identification Unit. Officer Welsh testified he examined the firearm found in the bedroom on North Paxon Street on September 9, 2019 and prepared a report.[59] Officer Welsh testified the recovered firearm is a .38 caliber Smith & Wesson revolver, Eastern Arms Company make manufactured by Meridian.[60]  Officer Welsh testified he tested the firearm and found it operable.[61]

In phase two of the trial, the United States adduced evidence from Special Agent Kyle Raguz, Bureau of Alcohol, Tobacco, Firearms and Explosives, qualified as an expert in whether certain firearms travelled in interstate commerce. Special Agent Raguz examined the firearm found in Mr. Mack's bedroom—the .38 caliber revolver—and concluded Meridian Arms Company manufactured the revolver in Connecticut and then sold it under the brand name Eastern Arms Company.[62] Special Agent Raguz opined the firearm travelled in interstate commerce.[63]

Special Agent Raguz examined the ammunition recovered from Mr. Mack's bedroom and prepared a report.[64] Special Agent Raguz testified he identified five different types of ammunition, manufactured by Remington, Tula Ammo, Speer Ammo, and Federal Ammo in Arkansas, Russia, Idaho, and Minnesota, respectively.[65] Special Agent Raguz opined the ammunition travelled in interstate commerce.[66]

Mr. Mack testified in his defense. On direct examination, Mr. Mack testified Agent Tiffany called him and they arranged a meeting for September 9, 2019 at his uncle's house.[67] Mr. Mack testified he did not tell Supervisor Wank he "was staying at 133 North Paxon Street"; never said he held the ammunition for a friend; and never said he had the firearm for protection.[68]

On cross-examination, Mr. Mack admitted he signed the order for release on parole form listing conditions of parole including he may not change his approved residence without written permission from parole supervision staff.[69] Mr. Mack admitted to his felony convictions on state charges of armed robbery and carrying a firearm without a license and admitted he began serving his sentence in January 2009 until his parole over seven years later in October 2016.[70]

Mr. Mack testified he does not know the phone number of his cell phone used to call Agent Tiffany because he "always stayed with a new phone."[71] Mr. Mack denied the cell phone number

Agent Tiffany had for him was his number and the number from which he called her is his number.[72]

With regard to his residence, Mr. Mack conceded he no longer lived at 5844 Vine Street but still paid rent there, and that is why he did not tell parole agents he moved.[73] Mr. Mack testified he had some of his belongings at 5844 Vine Street and some of his belongings at his mother's house, and denied moving his belongings to his uncle's apartment at 133 North Paxon Street.[74] Mr. Mack testified he chose to meet with agents at his uncle's apartment on North Paxon Street as a "common meeting ground."[75]

When asked to explain his recorded jail call with his uncle where he stated, "They opened my jawn without a warrant, you feel me, my safe," Mr. Mack testified he did not want to incriminate his uncle over a recorded jail call.[76] Mr. Mack denied ever seeing the firearm recovered from the bedroom on September 9 until discovery in this case.[77]

Mr. Mack denied owning the $ 911 found in the safe in the bedroom of 133 North Paxon Street.[78] When asked to explain his recorded jail call with his mother regarding money to pay for an attorney, Mr. Mack conceded he said the money in the safe is his money (and his safe).[79] Mr. Mack stated he did not want to incriminate himself and told his mother "little white lies in there, but it's truthful for the most part."[80]

Mr. Mack did not deny telling his father in the December 1, 2019 recorded jail call, "I'm hoping one of these jawns gonna get granted, but the way they searched my house, it was like –", and conceded agents only searched 133 North Paxon Street and did not search 5844 Vine Street or his mother's house.[81]

We gave Mr. Mack the opportunity to address any issues raised on cross-examination. Mr. Mack explained to the jury the recorded jail calls: "I indicated a lot of stuff as 'my' over phone

calls. But me saying 'my' over a phone call that you know being recorded and you know you are in the preliminary stages of a trial, it's just me saying - - talking about my case with family members like my mother who don't know anything about law. So there is no need for me to go into, oh, they found the safe and it belongs to him at approved property of somebody else. But I am just saying 'my' to a lot of stuff. But it does not mean that I am actually saying that is my stuff."[82]

Mr. Mack's testimony closed phase one of the trial.

### C.      Phase One of the trial: jury hopelessly deadlocks on Counts One and Two.

After the close of evidence in phase one, we instructed the jury and they began deliberations. After messages from the jury it could not reach a unanimous verdict on Counts One and Two, and after twice instructing the jury to try to reach unanimity, the jury advised of being hopelessly deadlocked. After discussion with the parties on the record outside the jury's presence, we declared a mistrial on Counts One and Two with the consent of both parties.[83]

### D.      Phase Two of the trial: jury found Mr. Mack guilty on Counts Three and Four.

After we declared a mistrial on the drug possession and related firearm charges, we moved to phase two of the trial: the felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g) as charged in Counts Three and Four of the superseding indictment.

The United States and Mr. Mack presented opening arguments. The United States presented as witnesses: Supervisor Wank; Special Agent Santo; and Special Agent Raguz. Mr. Mack did not testify in phase two of the trial. The United States moved into evidence five exhibits. Mr. Mack did not make a Rule 29 motion at the close of the United States' case.

The jury returned a guilty verdict against Mr. Mack on the charges of felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g), Counts Three and Four of the superseding indictment.[84]

## II.    Analysis

Mr. Mack moves under Rule 29 for acquittal on the felon in possession charges in phase two of the trial. He challenges: (1) sufficiency of the evidence; (2) prosecutorial misconduct by the United States attorneys, including failure to correct "knowing perjury" by its witnesses violating his due process rights; and (3)  the legality of agents' search of the North Paxon Street residence under the Fourth Amendment.[85]

The United States responds the evidence overwhelmingly established Mr. Mack knowingly possessed a firearm and ammunition on September 9, 2019 knowing he had been convicted in a court of a crime punishable by imprisonment for a term exceeding one year; prosecutorial misconduct is not a basis for acquittal under Rule 29 and, even if it is a basis, no misconduct occurred and the overall evidence of Mr. Mack's guilt is overwhelming; and Mr. Mack raised his Fourth Amendment claims in his suppression motion, which the court denied, and Rule 29 does not provide a basis for relief.[86]

Rule 29 provides "[a]fter the government closes its evidence . . ., the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[87] A Rule 29 motion may be made after a guilty verdict.[88]

"In any review of the sufficiency of the evidence supporting a criminal conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[89] This is a "particularly" and "highly" deferential standard.[90] We are

required to "draw all reasonable inferences in favor of the jury's verdict" and "a finding of insufficiency should be 'confined to cases where the prosecution's failure is clear.'"[91] "[W]e must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury."[92] "[W]e review the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt."[93] We assess the jury's verdict "from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'"[94]

Applying the highly deferential standard, we deny Mr. Mack's Rule 29 motion. The jury's verdict is supported by sufficient evidence.

### A.    The jury's conviction on felon in possession of a firearm and ammunition is supported by substantial evidence.

The United States charged Mr. Mack with possession of a firearm and ammunition as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Section 922(g)(1) makes it unlawful for "any person -- . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."[95]

The United States must show Mr. Mack: (1) knowingly possessed a firearm and ammunition; (2) knew he is a member of a class of persons prohibited from possessing firearms and ammunition; and (3) the firearm and ammunition were in the stream of interstate commerce. The United States Supreme Court in *Rehaif v. United States*[96] added the "knowledge-of-status" element to the United States' burden of proving a section 922(g)(1) offense. After *Rehaif*, the

United States "must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."[97]

Mr. Mack argues there is insufficient evidence on each element of the section 922(g)(1) charges to support the jury's verdict and the United States failed to meet its burden of establishing guilty beyond a reasonable doubt. Mr. Mack contends the United States failed to adduce sufficient evidence: (1) he possessed a firearm; (2) he knew he belonged to the relevant category of persons barred from possessing a firearm and ammunition; and (3) an actual, operable firearm.[98] He supports his motion by arguing witness credibility; the jury's deadlock on phase one of the trial and the questions it asked of the Court during deliberation demonstrates lack of evidence to support a guilty verdict in phase two of the trial; and the United States' failure to present new evidence to support a conviction on the section 922(g)(1) charges in phase two of the trial, arguing evidence presented in phase one of the trial cannot be used as evidence in phase two of the trial.

Based upon review of the evidence presented at trial and considering it in the light most favorable to the United States, Mr. Mack's Rule 29 motion is denied. The evidence showed each element of the section 922(g)(1) charges. On the first element, possession of a firearm, Agent Tiffany testified she went to Mr. Mack's last approved addressed at 5844 Vine Street and did not find him or his belongings there; Agent Tiffany and Supervisor Wank testified Mr. Mack arranged to meet with them at 133 North Paxon Street and told them he moved there without permission and he wanted to live there; expert testimony based on T-Mobile cell towers showed Mr. Mack made nearly seventy-five percent of his cell phone contacts from cell towers located near 133 North Paxon Street in the month leading to his arrest on September 9, 2019; and recorded jail phone calls where Mr. Mack told his family and girlfriend he owned the belongings in the bedroom at 133 North Paxon Street. Mr. Mack's testimony is he did not live at 133 North Paxon Street,

none of the items in the bedroom belong to him, and the cell phone records attributed to his phone number from Agent Tiffany is not his number and he does not remember his number.

Viewing the evidence in the light most favorable to the United States, there is more than sufficient evidence for the jury to find the possession element of the section 922(g)(1) offenses. This is a highly deferential standard. The jury heard the evidence and weighed the credibility of the United States' evidence against Mr. Mack's testimony. We are not to usurp the role of the jury.

On the second element—Mr. Mack knew he belonged to the relevant category of persons barred from possessing a firearm and ammunition—the United States adduced Mr. Mack's conviction and incarceration records showing his conviction on January 8, 2009 on offenses carrying terms of imprisonment of an eight to seventeen-year sentence for robbery and a five to ten-year sentence for carrying a firearm without a license.  On cross-examination, Mr. Mack conceded his status including over seven years in prison on state charges until his parole. Agent Mammarella reviewed the conditions of parole with Mr. Mack and Mr. Mack signed the documents listing conditions of parole, including the prohibition on owning a firearm and ammunition.

On the third element, the United States produced expert testimony the firearm and ammunition recovered from the bedroom on September 9, 2019 travelled in interstate commerce. The United States produced expert testimony the recovered firearm is operable.  The United States met the interstate commerce element.

The evidence is more than sufficient to support the jury's verdict. Mr. Mack based his defense on disclaiming the firearm and ammunition and everything else found in the bedroom on September 9, 2019 are  his. Despite referring to these belongings as his in recorded jail calls, he explained he did not want to incriminate his uncle and he only referred to the items as "my stuff"

as a short hand way of referring to the "stuff" found in the room and it does not mean he "[is] actually saying that it is my stuff." Again, the jury made credibility determinations and found Mr. Mack guilty.

Mr. Mack makes much out of the jury's deadlock on Counts One and Two, the drug trafficking and related firearm charges. We instructed the jury they could find Mr. Mack guilty of possession with intent to distribute a mixture and substance containing a detectable amount of cocaine and a mixture and substance containing a detectable amount of cocaine base with the intent to distribute the controlled substance—a drug trafficking crime—only if the United States proved beyond a reasonable doubt Mr. Mack possessed a mixture or substance containing a controlled substance; he possessed the controlled substance knowingly or intentionally; he intended to distribute the controlled substance; and the controlled substance was cocaine or cocaine base. The United States argues Counts One and Two, unlike the felon in possession charges of Counts Three and Four, required proof of Mr. Mack's intent to distribute drugs. The United States concedes these are "facts that were admittedly the most difficult in this case to prove" and on which it "had not presented evidence of any actual drug distribution by [Mr.] Mack, and [Mr.] Mack did not make admissions about being a drug-dealer, while he had made multiple admissions about the gun and the ammunition."[99] The United States argues the jury's deadlock shows the jury's careful consideration of the evidence.

After phase two of the trial, we instructed the jury it could find Mr. Mack guilty of unlawful possession of a firearm and ammunition by a person prohibited from doing so only if the United States proved beyond a reasonable doubt: Mr. Mack knowingly[100] possessed[101] a firearm and/or ammunition; at the time of the charged act–September 9, 2019–Mr. Mack had been convicted in a court of a crime punishable by imprisonment for a term exceeding one year; at the time of the

charged act, Mr. Mack knew he had been convicted in a court of a crime punishable by imprisonment for a term exceeding one year; and Mr. Mack's possession of the firearm and/or ammunition was in or affected interstate or foreign commerce.[102]

Mr. Mack argues the jury's questions asked of the Court during deliberation demonstrates lack of evidence on phase two of the trial. For example, in phase one of the trial, the jury returned questions for the court: "Give the exact definition of reasonable doubt"; "Can evidence not presented be basis of reasonable doubt?"; and "Does reasonable doubt only apply to the evidence or lack of evidence?"[103] After being sent back to deliberate, the jury returned with questions: "Why were there inconsistencies between testimony between parole agents [sic]?"; "Can we look at the transcripts of parole agents [sic] testimony?" and, with regard to a jury instruction "in weighing the effect of an inconsistency . . .", asked "how can we determine if the matter is of importance or insignificant?"[104] Mr. Mack argues these questions show he established reasonable doubt "through lack of evidence." He argues the United States in phase two offered only the testimony of Special Agent Raguz to show the firearm and ammunition travelled in interstate commerce and offered no new evidence to prove its case in phase two. Mr. Mack reasons because the jury had questions on reasonable doubt in phase one of the trial, it must have had reasonable doubt in phase two of the trial, making its verdict unreasonable and not supported by the evidence.

Mr. Mack's argument does not require such a finding. The jury heard all the evidence. It deadlocked on the drug trafficking charges but found Mr. Mack guilty on the felon in possession of a firearm and ammunition charges. The drug trafficking charges require different elements of proof than the elements of a felon in possession charge.   The jury could readily find Mr. Mack did not possess the narcotics and did not intend to distribute them.  It could also rationally find no reasonable doubt as to possessing the gun and ammunition.  These findings are not inconsistent.

As detailed above, the evidence is sufficient for the for a rational trier of fact to find Mr. Mack met the elements of the section 922(g)(1) offense. We agree with the United States the fact the jury deadlocked on the drug trafficking charges—with different elements than the felon in possession charges—does not somehow make the evidence to support the felon in possession charges insufficient for the jury to find guilt beyond a reasonable doubt.

As to the possession element of the section 922(g)(1) offense, Mr. Mack argues he proved "through the government's witness that [his] uncle was in fact the owner of the room searched in which he claims the drawer were the ammunition and firearm was found belonged to him and never stated that Mr. Mack had knowledge of any of the contends stored within the drawer [and] Mr. Mack's fingerprints or DNA was never found on the firearm or ammunition proving Mr. Mack never had these items in his possession at any time therefore he could not of known of the contraband [and] furthermore no one ever gave testification to Mr. Mack having knowledge of the firearm and ammunition prior to being found [sic]."[105] It is for the jury to evaluate evidence and assess credibility. It did so, finding Mr. Mack guilty on the gun possession charges. Mr. Mack disagrees with the jury's factual findings, but this does not mean the evidence is insufficient.

Mr. Mack additionally argues the United States failed to adduce sufficient evidence to support a guilty verdict on the felon in possession charges because it relied on evidence adduced in phase one of the trial to prove its case in phase two of the trial. Applying the well-settled, highly deferential standard of review in a Rule 29 motion, the evidence provided a sufficient basis for a reasonable juror to find Mr. Mack guilty beyond a reasonable doubt of possessing a firearm and ammunition as a convicted felon in violation of section 922(g)(1). We deny Mr. Mack's Rule 29 motion based on the sufficiency of the evidence.

**B.      There is no evidence of prosecutorial misconduct or witness perjury.**

Mr. Mack seeks acquittal under Rule 29 arguing prosecutorial misconduct. Rule 29 does not provide relief for alleged prosecutorial misconduct. A Rule 29 motion addresses only the sufficiency of the evidence.[106]

Mr. Mack's argument may be more properly raised as a motion for a new trial under Federal Rule of Criminal Procedure 33, which he did not make, providing "the court may vacate any judgment and grant a new trial if the interest of justice so requires" and "may be applied where there is a finding of prosecutorial misconduct . . .."[107] Even construing Mr. Mack's allegation of prosecutorial misconduct as a Rule 33 motion, we deny it.

"Improper prosecutorial conduct rises to the level of constitutional error when it 'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding.'"[108] A "defendant seeking a new trial on the basis of prosecutorial misconduct must prove not only that prosecutorial misconduct in fact occurred, but also that it rose to such a level as to render the jury's verdict unreliable."[109]

Mr. Mack accuses the United States attorneys of "misconduct" and "improper arguments throughout and during the summation of this trial." Twelve pages of his brief detail a laundry list of alleged misconduct falling into three broad categories: (1) evidentiary improprieties; (2) improper statements made during closings and "rebuttals" to prejudice the jury; and (3) use of perjured testimony.[110]

Nothing in the record of this matter, either in the discovery period or at trial, shows prosecutorial misconduct. Even if it did, nothing shows it rose to a level to render the jury's verdict unreliable.

*There is no merit to claims of evidentiary improprieties.*[111]

Mr. Mack contends the United States attorneys committed prosecutorial misconduct by using certain evidence:

- "Summary charts" for "opening and closing statements and throughout the course of testimony for every witness that the[y] presented and used them unfairly during presentations";

- Jail call recordings in which Mr. Mack discussed gathering items from his home after being arrested and taking them to his mother['s] home in an attempt to "paint a picture as if the home that Mr. Mack was alluding to was" 133 North Paxon Street. Mr. Mack contends the United States attorneys "knew that not to be the truth." He contends the United States attorneys and Agent Santo were present at the suppression hearing and heard Mr. Mack's uncle and mother testify they retrieved Mr. Mack's belongings from 5844 Vine Street and took the belongings to his mother's house, but the United States "swayed the jurors into believing that Mr. Mack was talking about" North Paxon Street on the recorded calls;

- Summary chart of the cell phone number attributed to Mr. Mack showing cell site activity to prove "constructive possession which is a stretch." Mr. Mack contends he contested at trial the cell phone number attributed to him is not his phone number and objected at trial, but the United States attorneys used his phone number at trial. Mr. Mack contends the United States did not recover the phone with the number attributed to him and the "cell phone subscribed information came back as not being registered to Mr. Mack";

- Failed to produce evidence in discovery about the phone number attributed to him and the United States attorneys' method of deriving the numbers his cell phone called from the phone numbers he called from prison (the phone numbers of his uncle, mother, and girlfriend), was not disclosed in the United States' motion *in limine*, is grossly unfair and prejudicial to him, and Mr. Mack did not have the opportunity to prepare a defense "for this tactic";

- Used the screen shot from Agent Tiffany's phone of Mr. Mack's cell phone contact number taken only a "couple of days before trial" which Agent Tiffany "could have easily made that contact info [sic] at any [time] to corroborate the government's theory especially when she was admittedly prepped for trial by the prosecution . . .";

- Used "release conditions, parole conditions, and documents from an arrest stemming from" Mr. Mack's 2008 state felony convictions which did not "prove any element to any crime charged" and "all it did was furthermore characterize the defendant and give the jurors insight to criminal history which should not have been allowed before Mr. Mack even decided to testify"; and

- Advised the Court before the start of trial "that they 'somehow' learned what Mr. Mack planned on presenting for defense and Mr. Mack should not be able to question the illegal search" of 133 North Paxon Street.

As detailed above, the United States moved for the admission, through pre-trial motions *in limine*, to admit (1) background evidence of Mr. Mack's status as a state parolee; (2) prior convictions as impeachment under Federal Rule of Evidence 609(a)(1) if Mr. Mack testified; (3) recorded calls and transcripts of six telephone calls between Mr. Mack and family while incarcerated; and (4) a determination cell phone site and call details of Mr. Mack's cell phone in the month leading up to his September 9, 2019 arrest, certified conviction records, and certified incarceration records qualify as business records and/or public records under Federal Rules of Evidence 803(6), (8).[112]

Mr. Mack elected not to respond in writing to the motions *in limine*. We held argument at our final pre-trial conference on the motions *in limine*, including a *Starks* hearing on the authenticity of the recorded jail calls. We granted the United States' motion to admit audio recordings and transcripts after evaluating the credibility of witnesses and evidence adduced during an evidentiary hearing.[113] The United States played the tapes of Mr. Mack's jail calls with his mother, uncle, and girlfriend. The United States laid an evidentiary foundation of Mr. Mack's cell phone number through the testimony of Agent Tiffany and T-Mobile cell phone records. Mr. Mack disputes the number Agent Tiffany attributed to him through her screen shot of his contact information. The United States adduced sufficient evidence of Mr. Mack's cell phone number. Mr. Mack simply disagrees the number attributed to him is (or was) his cell phone number. He had the opportunity to cross-examine every witness. He testified Agent Tiffany did not call him on the phone number attributed to him and testified he could not remember his phone number.[114] Mr. Mack simply disagrees with the evidence. There is no evidence of prosecutorial misconduct.

Mr. Mack alleges prosecutorial misconduct by introducing at trial his parole conditions, conviction, and incarceration records. We reviewed these records in connection with the United States' motion *in limine* which Mr. Mack elected not to respond in writing. We held oral argument on the motion *in limine* at the pre-trial conference where Mr. Mack objected. We found these records authentic and admissible under Federal Rules of Evidence 803(6), (8) and granted the United States' motion *in limine*.[115] There is no prosecutorial misconduct in using documents we admitted.

On the alleged improper use of charts and summaries, the United States attorney did not use charts or summaries during phase one or phase two openings. In phase two, the United States used a power point presentation during its closing. The United States attorney previewed its power point presentation for the Court and Mr. Mack outside the presence of the jury. After modifying the power point slides based on Mr. Mack's objections and argument on the record, we permitted the United States to use its power point presentation during its closing in phase two.[116] There is no prosecutorial misconduct in using the power point slides, modified to Mr. Mack's objections.

### *The United States attorneys did not make improper statements during openings, closings, questioning, or on "rebuttals" to prejudice the jury.*[117]

Mr. Mack contends the United States attorney's statements made during openings, closings, rebuttal to his closing argument, and questioning of witnesses prejudiced him. He argues these statements constitute prosecutorial misconduct and prejudiced him when the United States attorneys:

- Implied during cross-examination of Mr. Mack of "his criminal lifestyle" creating unfair prejudice and bias;

- Implied, on cross-examination, Mr. Mack's familiarity with revolvers;

- "Gave rebuttals that were unfair and insufficient" because Mr. Mack's fingerprints and DNA "were never found on any objects in this case";

- "Gave rebuttals with explanations as to why [their] two key witnesses Agent Wank and Agent Tiffany's stor[ies] didn't match . . .";

- Made statements about "defense counsel" – which we assume is Mr. Mack – suggesting Mr. Mack "was trying to gain sympath[y] from the jury and trying to play a victim role of big bad government against little ole [sic] me which was insufficient" and suggested "improper conduct by defense counsel . . . undermine[d] the proceedings, [and] impute[d] thoughts and bad judgment to the defense counsel";

- Implied Mr. Mack "was asking for sympathy[y] and trying to inflame the passion of the jurors," suggested Mr. Mack "could of [sic] easily gained access to the gun that was in his drawer when laying right next to it in his bed inside of his home" where there is no evidence to "back these statements."

There is no support in the record the United States implied Mr. Mack's "criminal lifestyle" during his cross-examination. To the extent Mr. Mack means reference to his status as a parolee, we granted the United States' motion *in limine* to refer to Mr. Mack's status as a parolee for context of the parole agents' actions on September 9, 2019.[118] At our final pre-trial conference, the United States agreed to a proper limiting instruction. We gave the jury a limiting instruction it may only consider Mr. Mack's parole status for context of why agents went to 133 North Paxon Street, and for no other reason.[119] Having permitted the United States to refer to Mr. Mack's status as a parolee, we cannot find misconduct. And Mr. Mack opened the door when he raised the issue of his parole status when cross-examining Supervisor Wank and Agent Tiffany.

We granted the United States' motion *in limine* to admit evidence of his previous state felony convictions from 2009–first degree robbery and carrying a firearm without a license–for impeachment if Mr. Mack chose to testify, with a proper limiting instruction.[120] Mr. Mack testified, and the United States questioned him on his state felony convictions as impeachment as our order allowed. There is no misconduct.

On cross-examination, the United States attorney questioned Mr. Mack regarding his familiarity with revolvers only after Mr. Mack questioned the firearms expert on whether the revolver found by Supervisor Wank could be cocked.[121] This is a proper line of questioning after Mr. Mack opened the door challenging Supervisor Wank's testimony. Mr. Mack did not object to this line of questioning and denied having familiarity with firearms. The jury evaluated this testimony for credibility.

Mr. Mack identifies prosecutorial misconduct by making "unfair and insufficient" "rebuttals" at trial where Mr. Mack's fingerprints and DNA were not "found on any objects in this case" and providing explanations "as to why . . . Agent Wank and Agent Tiffany's stor[ies] didn't match." Special Agent Santo testified on direct examination he did not test the firearm found in the bedroom for fingerprints and explained why he did not do so.[122] Mr. Mack had the opportunity to cross-examine Special Agent Santo on this topic and, in fact, did so.[123] The jury evaluated Special Agent Santo's credibility. There is no prosecutorial misconduct.

We cannot divine from Mr. Mack's brief what he means by the United States attorneys' explanation for why Supervisor Wank's and Agent Tiffany's "stories didn't match." It is for the jury to determine whether the agents' "stories" matched or did not match; these are credibility and evidentiary evaluations for the jury.

Mr. Mack alleges misconduct by the United States attorney when, in rebuttal to Mr. Mack's closing statement in phase two of the trial, the United States commented: "The defendant has made numerous claims to play to your sympathy, and that is in an effort to distract you and get you to ignore the overwhelming evidence in this case."[124] Mr. Mack did not object to this statement. Because he did not object to this statement in closing argument, we review for plain error.[125] "To demonstrate plain error, [Mr. Mack] must establish, among other things, that any misstatement by

the prosecutor 'affected the outcome of the district court proceedings.'"[126] There is no evidence in the record the reference to Mr. Mack's "claims to play on your sympathy . . . in an effort to distract you and get you to ignore the overwhelming evidence in this case" affected the outcome of the trial. The jury heard testimony from multiple witnesses regarding Mr. Mack: Agent Tiffany testified she could not locate Mr. Mack at his approved residence at 5844 Vine Street and issued an absconder warrant; Mr. Mack contacted the parole office and told Supervisor Wank of his address at 133 North Paxon Street; when Agent Tiffany and Supervisor Wank went to 133 North Paxon Street as agreed, Mr. Mack admitted them to the house and up the stairs to his bedroom; Mr. Mack failed his drug test, Supervisor Wank saw in plain view boxes of ammunition, and a wider search revealed a firearm; Supervisor Wank and Agent Tiffany testified Mr. Mack blurted out he held the ammunition for a friend and had the firearm for protection; cell phone records for Mr. Mack's cell phone show seventy-five percent of calls made in the month leading to his September 9, 2019 arrest were picked up by cell towers near 133 North Paxon Street; and recorded jail telephone calls with family and his girlfriend recorded Mr. Mack referring to the belongings in the bedroom of 133 North Paxon Street as his "stuff."  Mr. Mack cross-examined the United States' witnesses and testified on his behalf. The jury made credibility determinations based on the evidence; any misstatement by the United States attorney did not affect the outcome given the overwhelming evidence against Mr. Mack.

With regard to comments made by the United States attorney about evidence, particularly in reference to Mr. Mack's ability to access the gun near his bed, our Court of Appeals instructs "[i]t is fundamental that counsel 'may argue reasonable inferences from the evidence,' but may not 'misstate evidence.' A prosecutor's misstatement of the evidence can 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'"[127] "[A]ssessing the

prejudice of the prosecutor's comments during closing argument, we must consider 'the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction.'"[128] But we need not make such an assessment because the United States attorney did not misstate the evidence; Supervisor Wank testified he found a revolver in the clear plastic storage unit of the bedroom where Mr. Mack agreed to meet parole agents. Agent Tiffany testified to Supervisor Wank's finding of the revolver. Mr. Mack does not dispute the presence of the revolver; he only disputes he possessed the revolver. Mr. Mack had the opportunity to cross-examine witnesses and testify regarding the revolver. Simply because Mr. Mack disagrees with the United States does not mean the United States attorney, arguing reasonable inferences to be drawn from the evidence, misstated evidence.

### *There is no evidence the United States used perjured testimony.*[129]

Mr. Mack contends the United States attorney knowingly used perjured testimony, including by "prepping" its witnesses for trial by:

- "Prepping" Supervisor Wank and Agent Tiffany to coordinate their testimony at hearings on the state criminal action and at the suppression hearing in this action. Agent Tiffany admitted on cross-examination she and Supervisor Wank "met with the prosecution in order to be prepped for questioning and answers at trial," suggesting the United States "prepped" the agents to "ha[ve] a story to match the [recorded jail] phone conversations";

- Using perjured testimony of Supervisor Wank, Agent Tiffany, and the cell site expert to show Mr. Mack moved from his approved residence to 133 North Paxon Street to "try and prove the search" of the North Paxon Street bedroom "was indeed legal" and Mr. Mack did not have the opportunity to cross-examine the "prosecution's theory";

- Adducing expert testimony from Special Agent Updegraff giving "harmful opinionated statements outside his expertise and not related to the evidence" and admitted on cross-examination he testified "thousands of times" on behalf of the United States and "being under payola" demonstrating his bias; and

- Using Special Agent Santo as the last person to testify and presented him as a lay witness, not an expert. Mr. Mack contends as a lay witness, Special Agent Santo should have been sequestered from the testimony of other witnesses but was not, allowing him to "sit back and analyze every person's testimony[,] listen to the defense and corroborate his testimony to the government's theory which was grossly unfair and prejudice."

Preparing for trial surely does not constitute prosecutorial misconduct, and we assume Mr. Mack accuses the United States of directing Supervisor Wank's and Agent Tiffany's testimony. There is no evidence Supervisor Wank, Agent Tiffany, Special Agent Plesniak, as the cell site expert, perjured themselves or the United States attorney knowingly used perjured testimony. To the extent Mr. Mack argues he did not have the opportunity to cross-examine the prosecution's theory, it is denied. Mr. Mack had the opportunity to cross-examine, and did examine, each witness for the United States.

Mr. Mack's accusation regarding Special Agent Santo is equally without merit. Mr. Mack did not object to Special Agent Santo's presence in the courtroom as the representative of the Bureau of Alcohol, Tobacco, Firearms and Explosives, the agency investigating the charges against Mr. Mack. There is no evidence he perjured himself.

There is no evidence Special Agent Updegraff perjured himself because he is "under payola." Special Agent Updegraff testified to his expertise in narcotics. Mr. Mack did not object to his qualification as an expert or to his testimony and cross-examined Special Agent Updegraff. The United States called Special Agent Updegraff as a witness in the drug trafficking charges of phase one, charges on which the jury ultimately deadlocked.

Mr. Mack's accusations of perjury are unfounded and do not support a Rule 29 motion for acquittal. We deny his claims of prosecutorial misconduct entitle him to acquittal under Rule 29; such an argument is not a proper basis for a Rule 29 motion and, even if it could or even if we

construed his motion as one for a new trial under Rule 33, there is no evidence of prosecutorial misconduct.

### C.    We deny the Rule 29 motion based on Fourth Amendment challenges.

Mr. Mack argues he is entitled to acquittal for alleged Fourth Amendment violations related to the search of the bedroom at 133 North Paxon Street. Mr. Mack's Fourth Amendment challenges are not a basis for a Rule 29 motion.

Mr. Mack challenged the search of the bedroom in a suppression motion and supplemental motion.[130] We held a suppression hearing, heard, and evaluated testimony from Mr. Mack's uncle, his mother, Supervisor Wank, and Agent Tiffany. We found Mr. Mack failed to show a basis for suppression and denied his motion.[131] We issued detailed Findings of Fact and Conclusions of Law on the suppression motion.[132]

We understand Mr. Mack disagrees with our denial of his suppression motion. But this is not a basis for a Rule 29 motion for acquittal. Mr. Mack may appeal from our order disposing of his suppression motion, but we do not afford him Rule 29 relief on his Fourth Amendment challenges.

## III.    Conclusion

We deny Mr. Mack's Rule 29 motion.

---

[1] ECF Doc. No. 41. The United States also sought forfeiture.

[2] ECF Doc. No. 12.

[3] Two days after filing his suppression motion, Mr. Mack's attorney moved for a hearing on Mr. Mack's request for new court-appointed counsel. ECF Doc. No. 14. Mr. Mack asserted a breakdown in communication and conflict of interest between him and his attorney from the Federal Defender's officer. After a March 2, 2020 hearing, we excused the Federal Defender, appointed Mr. Mack counsel from the Criminal Justice Act Panel, and continued the scheduled

suppression hearing. ECF Doc. No. 18. Unhappy with his attorney from the Criminal Justice Act Panel, Mr. Mack requested we again remove his court-appointed counsel and continue his defense *pro se*. After a *Peppers* colloquy, we found Mr. Mack competent and capable of representing himself, and granted his request to remove his counsel and to proceed *pro se*. ECF Doc. No. 34, 47. We appointed new counsel from the Criminal Justice Act Panel as standby counsel. ECF Doc. No. 35. At our suppression hearing, we conducted another *Peppers* colloquy at the request of the United States. ECF Doc. Nos. 55, 73 at 4–12. Standby counsel remained on the case through trial. We appreciate standby counsel's diligence and professionalism.

[4] ECF Doc. No. 64, 65.

[5] *See* ECF Doc. Nos. 50, 51, 61, 67.

[6] *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975). In *Starks*, our Court of Appeals imposed on the United States the burden "to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of [audio] recordings . . .." *Id.* at 121.

[7] *See* ECF Doc. Nos. 79, 80, 81, 82, 83.

[8] ECF Doc. No. 135 at 41.

[9] ECF Doc. No. 112 at 237–38.

[10] *Id.* at 239–244.

[11] *Id.* at 243–44.

[12] ECF Doc. No. 115 at 63–65; Government's Exhibit 28, 29.

[13] ECF Doc. No. 112 at 172–73.

[14] *Id.* at 173.

[15] *Id.* at 173–75.

[16] *Id.*

[17] *Id.* at 60–66, 175–76.

[18] *Id.* at 67–68.

[19] *Id.* at 69.

[20] *Id.* at 68–69.

[21] *Id.* at 177–80.

[22] *Id.* at 176–77.

[23] *Id.* at 181–82.

[24] *Id.* at 184–85.

[25] *Id.* at 182–84.

[26] *Id.* at 70, 76, 184.

[27] *Id.* at 75-76.

[28] *Id.* at 77.

[29] *Id.* at 77-78, 186.

[30] *Id.* at 135.

[31] *Id.* at 78–79.

[32] *Id.*

[33] *Id.* at 80.

[34] *Id.* at 80-82.

[35] *Id.* at 84, 187.

[36] *Id.* at 84–90.

[37] *Id.* at 92, 199.

[38] *Id.* at 188–98.

[39] We determined the authenticity of these records at our final pre-trial conference, granting the United States' motion *in limine* for a determination the records qualify as business records and/or public records under Federal Rules of Evidence 803(6) and 803(8). *See* ECF Doc. No. 83.

[40] ECF Doc. No. 113 at 73; Exhibit 20.

[41] *Id.* at 77.

[42] *Id.* at 85.

[43] *Id.* at 86.

[44] *Id.* at 86–87.

[45] *Id.* at 87–90.

[46] *Id.* at 109–10, 140; Exhibits 33–34.

[47] *Id.* at 110.

[48] *Id.* at 117–18.

[49] *Id.* at 112–15.

[50] *Id.* at 141–43.

[51] *Id.* at 144–46 (emphasis added).

[52] *Id.* at 147–48 (emphasis added).

[53] *Id.* at 149–50.

[54] *Id.* at 151–53 (emphasis added).

[55] *Id.* at 153 (emphasis added).

[56] *Id.* at 155–56 (emphasis added).

[57] *Id.* at 157–58 (emphasis added). The United States adduced evidence Supervisor Wank and Agent Tiffany found $911 in the safe on September 9, 2019. ECF Doc. No. 113 at 159.

[58] *Id.* at 160–61 (emphasis added).

[59] ECF Doc. No. 112 at 275–76.

[60] *Id.* at 278–79.

[61] *Id.* at 279–81.

[62] ECF Doc. No. 115 at 89.

[63] *Id.* at 89–90.

[64] *Id.* at 90.

[65] *Id.* at 90–93. One manufacturer made two different kinds of ammunition. *Id.* at 90.

[66] *Id.* at 93.

[67] ECF Doc. No. 113 at 190.

[68] *Id.* at 196–97.

[69] *Id.* at 199.

[70] *Id.* at 198–99.

[71] *Id.* at 203–04.

[72] *Id.* at 216–17.

[73] *Id.* at 205–06.

[74] *Id.* at 206–07.

[75] *Id.* at 207–08.

[76] *Id.* at 211.

[77] *Id.* at 213.

[78] *Id.* at 217–18.

[79] *Id.* at 219–20.

[80] *Id.* at 219–21.

[81] *Id.* at 223–24.

[82] *Id.* at 224–25.

[83] ECF Doc. No. 115 at 21–26.

[84] ECF Doc. No. 96.

[85] ECF Doc. No. 124.

[86] ECF Doc. No. 134.

[87] Fed. R. Crim. P. 29(a).

[88] Fed. R. Crim. P. 29(c)(1).

[89] *United States v. Williams*, 974 F.3d 320, 370 (3d Cir. 2020) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

---

[90] *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc).

[91] *United States v. Smith*, 294 F.3d 473, 476–77 (3d Cir. 2002) (quoting *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996); *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

[92] *United States v. Shaker*, 827 F. App'x 204, 208 (3d Cir. 2020) (quoting *Caraballo-Rodriguez*, 726 F.3d at 430).

[93] *Caraballo-Rodriguez*, 726 F.3d at 430 (quoting *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010)).

[94] *Id.* at 431 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)).

[95] 18 U.S.C. § 922(g).

[96] —— U.S. ——, 139 S. Ct. 2191, 204 L.Ed.2d 594 (2019).

[97] *United States v. Nasir*, 982 F.3d 144, 160 (3d Cir. 2020) (quoting *Rehaif*, 139 S.Ct. at 2200).

[98] ECF Doc. No. 124 at 3–7.  Mr. Mack does not challenge the interstate commerce element.

[99] ECF Doc. 134 at 31.

[100] Taken from the Third Circuit Model Charge, we instructed the jury: "So first, knowingly, just to refresh ourselves. A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct and does not act through ignorance, mistake, or accident. In deciding whether Mr. Mack acted knowingly, you may consider all the evidence, including what the defendant did or said." ECF Doc. No. 115 at 139.

[101] Taken from the Third Circuit Model Charge, we instructed the jury: "To possess something means to have something within a person's control. The United States does not have to prove Mr. Mack physically held the firearm or ammunition, that is, actually had actual possession of it. As long as the firearm and ammunition, or ammunition was within Mr. Mack's control, he possessed it. If you find Mr. Mack either had actual possession of the firearm and ammunition or had the power and intent to exercise control over one of them or both of them, even though they were not in his physical possession, that is, Mr. Mack had the ability to take active possession of those objects when he wanted to do so, you may find the United States has proven possession. It can be momentary and it can be fleeting. The law also recognizes possession can be sole or joint. If one person alone possesses a firearm or ammunition, that is called sole possession. However, more than one person may have the power and intent to exercise control over a firearm, and we that joint possession. If you find Mr. Mack had such power, and intent, and he possessed the firearm, even though he possessed it maybe with another, jointly with another. Mere proximity to the firearm or ammunition or mere presence on a property where it is located or mere association with a person who does control the firearm or ammunition is insufficient to support a finding of possession. Proof, though, of the ownership of the firearm or ammunition is not required. The United States

need not demonstrate Mr. Mack possessed the firearm or ammunition with intent to cause harm. The United States must prove, instead, Mr. Mack knowingly possessed the firearm, or in Count 4, it's possession, as charged by the United States. This means Mr. Mack possessed the firearm in, in question 3, or the ammunition in question 4, purposely and voluntarily and not by accident or mistake. It also means that Mr. Mack knew the object was a firearm or knew it was ammunition. ECF Doc. No. 115 at 139–40.

[102] ECF Doc. No. 115 at 138.

[103] ECF Doc. No. 124 at 9, 38–41.

[104] *Id.*

[105] *Id.* at 4–5.

[106] "There is only one ground for a motion for a judgment of acquittal. This is that 'the evidence is insufficient to sustain a conviction' of one or more of the offenses charged in the indictment or information." 2A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE CRIMINAL § 466 (4th ed.) (footnote omitted).

[107] *United States v. Dixon*, 658 F.2d 181, 193 (3d Cir. 1981).

[108] *United States v. Elwell*, 515 F. App'x 155, 163 (3d Cir. 2013) (quoting *United States v. Morena*, 547 F.3d 191, 193–94 (3d Cir. 2008)).

[109] *United States v. Gagliardi*, No. 04–cr–796, 2005 WL 1592947, at *4 (E.D.Pa. July 5, 2005) (citing *United States v. Walker*, Nos. 94-cr-488, 94-cr-554, 2000 WL 378532, at *10 (E.D.Pa. Apr. 4, 2000)). *See also, United States v. Pelker*, No. 16-cr-240-01, 2019 WL 2160465, at *11 (M.D.Pa. May 17, 2019), *aff'd*, 821 F. App'x  93 (3d Cir. 2020) ("in order for prosecutorial misconduct to merit a reversal, however, [the] Court must find that it is more probable than not that the alleged misconduct influenced the jury's ultimate verdict") (quoting *United States v. Bates*, 46 F. App'x 104, 110 (3d Cir. 2002)).

[110] *See* ECF Doc. No. 124 at 18–25.

[111] *Id.* at 18–22, 23.

[112] *See* ECF Doc. Nos. 50, 51, 61, 67.

[113] ECF Doc. Nos. 80, 81.

[114] ECF Doc. No. 113 at 117.

[115] ECF Doc. No. 83.

[116] ECF Doc. No. 115 at 102–10.

[117] ECF Doc. No. 124 at 21–22, 24–25.

[118] ECF Doc. No. 79.

[119] ECF Doc. No. 113 at 278–79.

[120] ECF Doc. No. 80.

[121] ECF Doc. No. 113 at 212–13.

[122] *Id.* at 102–04.

[123] *Id.* at 176.

[124] ECF Doc. No. 115 at 132–33.

[125] *United States v. Rowe*, 811 F. App'x. 89, 93 n. 4 (3d Cir. 2020) (citation omitted).

[126] *Id.* (quoting *United States v. Fulton*, 837 F.3d 281, 294 (3d Cir. 2016)).

[127] *United States v. Swan*, 707 F. App'x  99, 107 (3d Cir. 2017) (quoting *Fulton*, 837 F.3d at 306).

[128] *Id.* (quoting *Fulton*, 837 F.3d at 311–12).

[129] ECF Doc. No. 124 at 19, 23, 26–30.

[130] ECF Doc. Nos. 12, 56.

[131] ECF Doc. No. 65.

[132] ECF Doc. No. 64.